THE UNITED STATES DISTRICT COURT
FOR THE SOUTHER DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CATHLEEN JUNE MCCARTHY, | § | |
| | § | |
| **Plaintiff,** | § | |
| v. | § | **CIVIL ACTION NO. H-10-1652** |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
## DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Before the Court in this social security appeal is Defendant's Cross Motion for Summary Judgment (Document No. 8) and Plaintiff's Motion for Summary Judgment (Document No. 9). Having considered the cross motions, the respective responses to these motions (Document Nos. 10, 11), the administrative record, the written decision of the Administrative Law Judge, and the applicable law, the Court ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment is GRANTED, Plaintiff's Motion for Summary Judgment is DENIED, and the decision of the Commissioner is AFFIRMED.

## I.     Introduction

Plaintiff Cathleen June McCarthy ("McCarthy") brings this action pursuant to Section 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. 405(g), seeking judicial review of an adverse final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for disability insurance benefits. McCarthy argues that the ALJ "erred in properly considering and evaluating all of [her] severe impairments and

effects they have on [her] ability to perform and maintain competitive employment." McCarthy moves the court to reverse the ruling or alternatively requests that the case be remanded for a new administrative hearing to consider all of McCarthy's severe impairments. The Commissioner, in contrast, responds that there is substantial evidence in the record to support the ALJ's decision that McCarthy was not disabled as a result of her impairments, that all of McCarthy's severe impairments were properly considered and evaluated, that the decision comports with the applicable law, and that it should therefore be affirmed.

## II.      Administrative Proceedings

McCarthy applied for disability insurance on April 10, 2008, claiming that she was disabled beginning October 10, 2000. Because McCarthy was insured for disability benefits only through September 30, 2002, the period under consideration was from October 10, 2000 through September 30, 2002. The Social Security Administration denied her application at the initial and reconsideration stages. (Tr. 68-71; 73-75). After that, McCarthy requested a hearing before the Administrative Law Judge ("ALJ"). (Tr. 77-78). The Social Security Administration granted her request and the ALJ, Gerald Meyer, held a hearing on February 10, 2009. At that time, the ALJ informed her that she could gather more evidence to make her case and continue on with counsel if she rescheduled her hearing to a later date. (Tr. 20-40). She chose to do so and appeared before the same ALJ on August 19, 2009. (Tr. 43-65). After this hearing, the ALJ determined that McCarthy was not disabled during the relevant dates. (Tr. 13).

McCarthy sought review of the ALJ's adverse decision with the Appeals Council. The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an

error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's

actions, findings or conclusions; or (4) a broad policy issue may affect the public interest. 20

C.F.R. § 404.970; 20 C.F.R. § 416.1470. After considering McCarthy's contentions in light of

the applicable regulations and evidence, the Appeals Council, on March 18, 2010, denied the

request for review and the ALJ's decision thus became final. (Tr. 1-3).

 McCarthy filed a timely appeal of the ALJ's decision. The parties have filed cross

motions for Summary Judgment (Document Nos. 8, 9).

## III. Standard for Review of Agency Decision

 The court's review of a denial of disability benefits is limited "to determining (1) whether

substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's

decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir.

1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision:

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial

evidence, shall be conclusive." The Act specifically grants the district court the power to enter

judgment, upon the pleadings and transcript, "affirming, modifying, or reversing the decision of

the Commissioner of Social Security with or without remanding the case for a rehearing" when

not supported by substantial evidence. 42 U.S.C. § 405(g). While it is incumbent upon the court

to examine the record in its entirety to decide whether the decision is supportable, *Simmons v.*

*Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the

record, nor try the issues de novo, nor substitute [its] judgment for that of the [Commissioner],

even if the evidence preponderates against the [Commissioner's] decision." *Johnson v. Bowen*,

864 F.2d 340 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 228 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1137 (5th Cir. 1973)).

## IV.    Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson* 864 F.2d at 344. The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C § 423(d)(1)(A). The impairment must be proven through medically accepted clinical laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in

which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity." *Anthony*, 954 F.2d at 293 (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).

The commissioner applies a five-step sequential process to determine disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe" impairment or combination of impairments, he will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5. If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience, and residual functional capacity, he will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.2d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 564.

Here, the ALJ found that McCarthy, despite her impairments and limitations, could perform sedentary work as defined in 20 CFR 404.1567(a) except that in addition to being limited to lifting 10 pounds occasionally and standing and/or walking about 2 hours of an 8-hour workday, she has postural limitations and can never kneel, crawl, or climb ladders ropes or scaffolds. In addition, she can only occasionally climb ramps and stars, occasionally balance, occasionally stoop, and occasionally crouch. Finally, she has environmental limitations and must avoid outside weather conditions, extreme heat or cold, and cannot work at unprotected heights, or around dangerous moving machinery. The ALJ further found that she could perform her previous work as a land sales credit collector. The Court must determine whether substantial evidence supports the ALJ's step four finding and whether the ALJ properly considered all of McCarthy's impairments.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126.

## V. Discussion

### A. Objective Medical Evidence

The medical record reveals that McCarthy had complained of and had been treated for a variety of healthy problems dating back to 1990 and continuing through the date of her hearing before the ALJ. Because McCarthy was also insured through September 30, 2002, and only

claimed to be disabled starting on October 10, 2000, only the medical evidence related to that period of time (October 10, 2000 through September 30, 2002) is relevant to the ALJ's decision.[1]

On September 3, 1993, McCarthy visited Dr. Lori J. Hillman, a podiatric physician and surgeon for peeling toenails. There, she related that she had possible SLE (lupus) because of a positive ANA test. (Tr. 527-28). On January 15, 1996, she visited Dr. Hillman again. (Tr. 540). At that visit, McCarthy complained of severe arch pain in her left foot. She claimed that her lupus flare up a week-and-a-half previous caused swollen joints, hair loss, generalized pain, and some facial flushing. (Tr. 540). She also described a history of probable Raynaud's Syndrome. She claimed that she was taking a number of medications, including Dynacin, which is an antibiotic she related that she took for lupus. (Tr. 540). She also related that she received a Kenalog injection for lupus a week and half earlier. (Tr. 540). Dr. Hillman found the following: callous medial left hallux, first MPJ, medial left heal, and 5th MPJ, mild edema left third and fourth toes and increased pain with forsiflexion of the left foot, point tenderness at the proximal medial midfoot and area of the left arch, no increased temperature or redness or ecchymosis. (Tr. 540). The doctor assessed McCarthy's condition as follows: "acute plantar fasciitis with probably partial rupture of the medial band of the plantar fascia possibly secondary to systemic steroids or SLE left foot." (Tr. 540). The doctor also advised her on casting options and told her of the required healing time for the rupture. (Tr. 540).

---

[1] In her brief, McCarthy claims that the relevant time period for consideration is from October 10, 2000 through December 31, 2009. As noted above, this claim is inaccurate as McCarthy was insured through September 30, 2002.

On January 5, 1995, McCarthy visited the Woodlands Womens Center, seeing Dr. John W. Durst, who prescribed her Prozac because she complained of being very tired and was depressed. (Tr. 647-49). Further, on July 6, 1996, she visited the Woodlands Community Hospital, where she was prescribed Prozac because of "lots of stress" and "depression." (Tr. 501).

On April 2, 2001, McCarthy visited Dr. Louise H. Bethea at the Allergy, Asthma, & Immunology Care Center, complaining of fatigue, hand and arm blisters, tinnitus, and sinusitis. (Tr. 555). The doctor suggested various medications, including an expectorant, a nasal corticosteroid spray, and another nasal spray. (Tr. 564).

On October 8, 2002, McCarthy visited Conroe Regional Medical Center complaining of chest pains. (Tr. 313). Tests were normal; she was diagnosed with "chest pain" and was prescribed Vicodin. (Tr. 310-20)

On October 22, 2002, McCarthy visited Dr. Carmen Perez-Masuelli, a rheumatologist, who noted McCarthy's complaints of having suffered from a butterfly rash since her teenage years, that she had been diagnosed with a positive ANA in 1990, and that she has experienced alopecia, photosensitivity, dryness of the eyes and mouth, fatigue, joint aches and pains and symptoms of Raynaud's Syndrome. (Tr. 356). Dr. Perez-Masuelli wrote in the family history that there was a "questionable diagnosis of systemic lupus in her grandmother but no one has been officially diagnosed with either lupus or rheumatoid arthritis." (Tr. 356). The examination at that time revealed that McCarthy appeared her age and was in no acute distress. (Tr. 357). Aside from multiple tender points and mild acrocyanosis of the fingers and toes, the examination revealed no significant problems. (Tr. 357). The doctor's impression was that McCarthy presented with fatigue, arthralgias, rash and Raynaud's. (Tr. 358). Prednisone and Plaquenil were

8

both prescribed to her. (Tr. 358). She saw Perez-Masuelli again in November of the same year. (Tr. 353). Her physical examination was the same, mostly normal, but the laboratory tests showed that she did have positive ANA and did test positive for Sjögren antibodies. (Tr. 353). The doctor's impression after this visit was that in addition to a positive ANA, she had arthralgias, myalgias, Raynaud's, and Sjögren's. The doctor prescribed an injection of Depo-Medrol and advised her to continue with Plaquenil and Prednisone but to taper off use of the Prednisone. (Tr. 353).

On October 29, 2002, McCarthy visited Dr. C. Downey Price, an eye doctor, because she claimed her field of vision had changed since taking Plaquenil. (Tr. 623). Dr. Price found no problems with her vision, but did note that McCarthy's diagnoses included "Connective Tissue Disorder" and "High Risk Meds." (Tr. 622). Also within the chart, the doctor wrote "Referred by Dr. Perez/Denyer d.t. high risk meds" and "Started 10-23-02 being treated for 'joint problems' no dx made yet." (Tr. 625).

The plaintiff's main contention here is that the ALJ erred in not applying the lupus listing (§ 14.02) directly. The ALJ, however, was not required to apply the lupus listing specifically unless objective medical evidence supported it. The only mention of lupus in the objective medical evidence before the date of last insured is the report from her podiatrist from 1996---evidence that does not provide any conclusive determination about her illness. Taking this evidence along with the aforementioned symptoms and diagnoses, specifically the 2000-2002 records about other connective tissue disorders, the ALJ applied the more general listing related to connected tissue disorder instead of lupus. This was not an attempt to ignore the mention of lupus (or Sjögren's) but was done in order to better address the medical record in its entirety. In its entirety, the evidence during the relevant time period points to the existence of some sort of

connective tissue disorder---not necessarily lupus.[2] The ALJ therefore did not err in applying the listing § 14.06. In his report, the ALJ wrote "In sum, the above residual functional capacity assessment is supported by the evidence that the claimant has been diagnosed with a connective tissue disease for several years. Many of the symptoms she alleges are consistent with that diagnosis." (Tr. 13). Here, because the objective medical record supports the ALJ's determination that her symptoms fell more appropriately under the aforementioned broader category of connective tissue disease, the ALJ did not err in failing to apply the lupus listing. Instead, the ALJ succeeded under the *Stone* standard to address the evidence in the medical record, and the record supports his conclusions.[3] *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985).

With respect to the plaintiff's complaint concerning depression and illness resulting from medication, the medical record supports the ALJ's decision. There are only two instances in the medical record that cite depression and those came many years before the relevant dates. Further, the only evidence of illness associated with medication comes from 2001, where McCarthy saw an eye doctor about her loss in vision from taking Plaquenil. As the ALJ notes in his report, "The claimant alleged a visual impairment, but vision testing failed to identify any visual impairment. Therefore this is not considered a medically determinable impairment." (Tr. 10).

The objective medical evidence supports the ALJ's decision including his consideration of listing § 14.06.

---

[2] While not within the appropriate time frame (but near, as the plaintiff herself noted in the ALJ hearing), the medical records from 2003, specifically those from Dr. Randall Johnson, do support the ALJ's determination that the more general category of connective tissue disorder was appropriate. Dr. Johnson wrote "Although I certainly can see that there is very likely that of an underlying connective tissue disorder, this cannot necessarily be relegated into a simply category, although Sjogren's syndrome may appear to be the most likely case for her." (Tr. 348).

[3] Even if the ALJ were to have applied the § 14.02 lupus listing, there is no evidence that plaintiff would have met all the criteria in § 14.02, and, in fact, the evidence is to the contrary.

### B.      Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. Unless good cause is shown to the contrary, "the opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusory and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 669 F.2d 1078 (5th Cir. 1981). Further, regardless of the opinions and diagnoses and medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995).

Here, there is very little relevant evidence of diagnosis or expert opinion. The podiatrist in 1996 did advise her to "remain non-weight bearing with crutches or a wheelchair for approximately 2 weeks and then continue with the cast for approximately an additional 4 weeks." (Tr. 540). As noted, in 2002, McCarthy's rheumatologist diagnosed McCarthy with arthralgias, myalgias, Raynaud's, and Sjögren's but did not make any determination as to McCarthy's ability to engage in work related activities. (Tr. 353). As such, the diagnosis and expert opinion factor also supports to ALJ's decision.

### C.      Subjective Evidence of Pain

The third element considered is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook*, 750

F.2d at 395. The proper standard for evaluating pain is codified in the Social Security Disability benefits Reform Act of 1984, 42 U.S.C. § 423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. 42 U.S.C. § 423. There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause the pain. *Id.* Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence in the record. *Id.* Under the Social Security Act, pain is a disabling condition only when it is "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Sellers*, 914 F.2d at 618-19 (citing *Harrell v. Bowen*, 862 F.2d 471, 480 (5th Cir. 1988)). Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994). The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has the opportunity to observe the claimant. *Hames*, 707 F.2d at 166.

McCarthy testified at her hearing before that ALJ that she could not work at her job as a new home sales agent because she had fatigue and joint pain, that she was on various lupus treatments, was receiving chemotherapy, had chronic diarrhea, and was suffering from a number of ailments caused by her Raynaud's syndrome. (Tr. 46-47). She also stated that she was unable to type and could not care for her home. (Tr. 47; 60).   She noted that she had many "side diseases," both physical and mental, that accompany her lupus. (Tr. 59). She claimed that she could not be exposed to sunlight and suffered from hair loss. (Tr. 60). She also testified that many of the treatments, including chemotherapy and steroids, have led to a number of medical issues including osteoporosis, high blood pressure, and damage to her eyes. (Tr. 61).

Her friend and professional colleague Debra Enlife, a State Farm agent, also testified on McCarthy's behalf. She testified that she had known McCarthy for twenty-one years and that they had worked together in real estate for many years. (Tr. 55). She claimed that McCarthy had been "very vibrant" but had become "very disabled" over the last ten years. (Tr. 55). Enlife referenced many occasions in which McCarthy would have to leave the table while eating to visit the bathroom. (Tr. 55). She claimed that McCarthy suffered from constant diarrhea, often exhibited a flushed face, and was "tired and sleepy." (Tr. 56). She also noted that McCarthy's fingertips would sometimes become white and that she bought gloves so that her fingertips would not become "white and frostbitten." (Tr. 56).

McCarthy's mother, Diane McCarthy, also testified on her behalf. She too noted that McCarthy had debilitating diarrhea for most of her adult years. (Tr. 56). She also testified that McCarthy had "tremendous" pain in her legs and that McCarthy required gloves to keep her hands warm. (Tr. 56). She testified that McCarthy's face was often flushed and appeared extremely red. She finally claimed that McCarthy had hair loss where a great deal of hair would fall out. (Tr. 57).

Linda Miller testified on McCarthy's behalf as well. McCarthy was a tenant of Miller's and has known her since the 1980's. (Tr. 57). Miller also worked with McCarthy in new home sales. (Tr. 57). Miller testified that new home sales was a job that required a great deal of physical effort and was "not really a secretary job." (Tr. 57). She noted that it required long hours in the heat and that such conditions took a toll on McCarthy. (Tr. 57). She testified that during work McCarthy would get so flushed in the face that she would have to take breaks by lying down in the car or would have to often come in to work late. (Tr. 57). She claimed that McCarthy suffered from pains in her stomach and diarrhea. (Tr. 58). She further testified that the

overall fatigue and lack of strength caused McCarthy to leave her job. (Tr. 58). Finally, she noted
that McCarthy suffered weight gain and hair loss and cited the numerous amount of pills
McCarthy was taking. (Tr. 58).

Justin McCarthy also testified. He supported the other witnesses' testimony and added
that McCarthy's conditions were "a little bit more severe than what they say." (Tr. 58). Finally,
George Miller, a "support person" for McCarthy, testified on her behalf. (Tr. 59). He claimed
that he would often have to step in to help her at home, with running errands, and with grocery
shopping. (Tr. 59).

In considering McCarthy's subjective complaints, as testified to by her, and corroborated
in part by others, the ALJ wrote:

> Once an underlying physical or mental impairment(s) that could reasonably be expected
> to produce the claimant's pain or other symptoms has been shown, the undersigned must
> evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to
> determine the extent to which they limit the claimant's ability to do basic work activities.
> For this purpose, whenever statements about the intensity, persistence, or functionally
> limiting effects of pain or other symptoms are not substantiated by objective medical
> evidence, the undersigned must make a finding on the credibility of the statements based
> on a consideration of the entire case record.
>
> The claimant alleged the inability to work due to fatigue and joint pain. She also stated
> that she suffered from chronic diarrhea during the period under consideration. She added
> that she had so many secondary diseases caused by her impairment. She said that
> sometimes her diseases were treated more aggressively than others. She stated that if she
> were exposed to sunlight, she developed a rash and her fair fell out. She said that there
> were many days that she was bed-bound. She also described the progression of her
> disease that caused her to quit a job that she loved.
>
> A friend of the claimant, Debra English, appeared and testified at the hearing that she had
> worked with the claimant prior to her stopping work. She noted that the claimant was
> suffering at that time with chronic diarrhea and that she wore gloves often because her
> fingers turned white. The claimant's mother, Diane McCarthy also appeared on her
> daughter's behalf and described her daughter as having pain in her legs and feet as a
> young girl. She also mentioned the claimant's diarrhea and reported the claimant to have
> a flushed face and hair loss. A past co-worker of the claimant, Linda Miller, stated that
> the claimant used to go out in the heat often while selling homes and would become so
> flushed that they were all afraid she would have a stroke. Ms. Miller went on to testify

that she saw a large decline in the claimant's health while working with her and that her weakness and fatigue finally caused her to stop working.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to caused the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

…

The claimant alleged the inability to work due to a number of impairments. Prior to the date last insured, there is little evidence to support her contention. She was apparently diagnosed with a connective tissue disease for which she was prescribed medication. Following the date last insured, she completed her college education. She was apparently well enough to handle her academic workload. The intensity and persistence of her pain and other symptoms is not documented by objective medical evidence. It would appear that if she were experiencing the extreme pain and other symptomatology she alleges, that she would have sought medical treatment. None of her treating physicians declared her to be disabled or advised her to stop working. The evidence does not fully support her allegations. They are only credible to the extent that they are consistent with the residual functional capacity assessment set out above.

As for the opinion evidence, State agency physicians found that the evidence prior to her date last insured was insufficient on which to make a determination of disability. Additional evidence was submitted at the hearing. Therefore, the opinion of the State agency physicians was not based on the evidence in its entirety and it is afforded little weight in this decision (Social Security Ruling 96-6p).

The opinions of the claimant's parents and friends who testified at the hearing were considered, but are not medical opinions and generally refer to the period of time after she was last insured for benefits. The opinions also carry little weight in this decision.

(Tr. 11-12) Credibility determinations, such as that made by the ALJ in this case in connection with McCarthy's subjective complaints, are generally within the province of the ALJ to make. *See Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) ("In sum, the ALJ is 'entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.'") (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)), *Cert. denied*, 514 U.S. 1120 (1995). The record shows that the ALJ did consider and evaluate the subjective testimony of McCarthy, her friends, and family, properly comparing it to the medical record.

Because the ALJ supported his credibility determination with references to the medical evidence and the testimony about McCarthy's activities, and because the ALJ did not rely on any improper factors, the subjective evidence factor also weighs in favor of the ALJ's decision.

### D.      Education, Work History, and Age

The fourth element considered is the claimant's educational background, work history, and present age. A claimant will be determined to be disabled only if the claimant's physical or mental impairments are of such severity that she is not only unable to do his previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(a).

The record shows that McCarthy was forty-four years old on the date of her hearing before the ALJ, had a high school education, a college degree in Interdisciplinary Studies, and was a new homes sales agent, which is light, skilled work, and was in credit collection sales which is sedentary, semiskilled work (Tr. 45-46). The ALJ concluded, after considering the entire record, that McCarthy had the residual functional capacity to perform her past relevant work as a land sales credit collector. (Tr. 11-13). The ALJ questioned a vocational expert, Ms. Ropan, who testified at the August 19, 2009 hearing that an individual with the conditions attributed to McCarthy could perform work in credit collection sales. (Tr. 62-63). The ALJ concluded from this testimony that "the claimant was capable of performing past relevant work as a land sales credit collector." (Tr. 13). The ALJ considered Ropan's testimony in his decision:

> The claimant performed this job six years prior to her date last insured for title II benefits. This job was performed at substantial gainful activity levels and she performed it long enough to learn the requirements of the job. It is therefore considered past relevant work.
>
> In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant was able to perform it as actually and generally performed. The vocational expert at the hearing testified that this job is generally performed at the sedentary level of exertion. The Claimant's description

16

of this job also conforms with the definition of sedentary work. The claimant is therefore found able to perform this past relevant work. The vocational expert was questioned regarding potential conflicts between her testimony and the information contained in the Dictionary of Occupational Titles, 4th Edition Revised. She testified that no conflicts existed. Her testimony is considered reliable (Social Security Ruling 00-4p).

(Tr. 13). Given the vocation expert's testimony, this final factor also supports the ALJ's decision.

## V.    Conclusion and Order

Considering the record as a whole, the Magistrate Judge is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which directs a finding of "not disabled" on these facts. *See Rivers v. Schwiker*, 684 F.2d 1144 (5th Circ. 1982). As all the relevant factors weigh in support of the ALJ's decision, the ALJ's decision was supported by substantial evidence and comports with applicable law. Therefore, the Court

ORDERS that Defendant's Motion for Summary Judgment (Document No. 8) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 9) is DENIED, and that the decision of the Commissioner is AFFIRMED.

Signed at Houston, Texas, this 16th day of June , 2011.

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE